FILED
IN OPEN COURT

OCT 23 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:12cr127 (LMB) |
| | ) | |
| JOHN C. KIRIAKOU | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

Should this matter proceed to trial, the United States would prove the following beyond a reasonable doubt:

1. At times in 2008 and 2009, in the Eastern District of Virginia, and elsewhere, defendant JOHN C. KIRIAKOU ("KIRIAKOU"), having had authorized access to classified information that identifies a covert agent, intentionally disclosed information identifying such covert agent to an individual not authorized to receive classified information, knowing that the information disclosed so identified such covert agent and that the United States government was taking affirmative measures to conceal such covert agent's intelligence relationship to the United States; in that the defendant disclosed the name of Covert Officer A to Journalist A in violation of Title 50, United States Code, Section 421(a).

2. KIRIAKOU was employed as an intelligence officer with the Central Intelligence Agency from in or about 1990 through in or about 2004. In the course of his career, KIRIAKOU served at CIA headquarters in Langley, Virginia, including at the CIA Counterterrorism Center ("CTC"), and in various classified overseas assignments.

3.   KIRIAKOU held a Top Secret security clearance with access to various Sensitive Compartmented Information ("SCI"), on account of his official responsibilities at the CIA. As a result, KIRIAKOU had regular access to classified and national defense information relating to CIA programs, operations, methods, sources, and personnel.

4.   On or about January 10, 1990, in connection with the start of his employment as a CIA intelligence officer, KIRIAKOU entered into various agreements with the United States, including the following:

   a.   As a condition of being granted access to classified information, KIRIAKOU entered into a Secrecy Agreement, in which he agreed, in pertinent part, as follows:

> I . . . hereby agree to accept as a prior condition of my being employed by, or otherwise retained to perform services for, the Central Intelligence Agency . . . the obligations contained in this agreement.
>
> I understand that in the course of my employment . . . I may be given access to information or material that is classified or is in the process of a classification determination . . . that, if disclosed in an unauthorized manner would jeopardize intelligence activities of the United States Government. I accept that by being granted access to such information or material I will be placed in a position of special confidence and trust and become obligated to protect the information and/or material from unauthorized disclosure.
>
> In consideration for being employed or otherwise retained to provide services to the Central Intelligence Agency, I hereby agree that I will never disclose in any form or any matter, to any person not authorized by the Central Intelligence Agency to receive it, any information or material . . . that I know is classified . . . or is in the process of a classification determination. . . .

> I understand that . . . the disclosure of information that I agreed herein not to disclose can, in some circumstances, constitute a criminal offense. . . .
>
> I understand that nothing in this agreement limits or otherwise affects any provision of criminal or other law that may be applicable to the authorized disclosure of classified information, including . . . section 793[ ] . . . of Title 18, United States Code . . . .

    b.    As a condition of being granted access to certain SCI, KIRIAKOU entered into a Non-Disclosure Agreement ("NDA"), in which he agreed, in pertinent part, as follows:

> Intending to be legally bound, I hereby accept the obligation contained in this Agreement in consideration of my being granted access within Special Access Programs, hereinafter referred to in this Agreement as Sensitive Compartmented Information (SCI). I have been advised that SCI involves or derives from intelligence sources or methods and is classified . . . . I understand and accept that by being granted access to SCI, special confidence and trust shall be placed in me by the United States Government.
>
> I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of SCI, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been approved for access to it, and that I understand those procedures . . . .
>
> I have been advised that unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause irreparable injury to the United States or could be used to advantage by a foreign nation. I hereby agree that I will never divulge anything marked as SCI or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization from the United States Government Department or agency . . . that last authorized my access to SCI. I understand that it is my responsibility to consult with appropriate management authorities in [the agency] that last authorized my access to

3

> SCI, whether or not I am still employed by or associated with [the agency] . . . .
>
> In addition, I have been advised and am aware that any unauthorized disclosure of SCI by me may constitute a violation or violations of United States criminal laws, including the provisions of . . . Section[ ] 793 . . . [of] Title 18, United States Code . . . .

5. KIRIAKOU entered into at least seven additional NDAs in the course of his CIA employment. In each instance, KIRIAKOU promised never to disclose SCI to anyone not authorized to receive it without prior written authorization from the United States Government and acknowledged that unauthorized disclosure of classified information could cause irreparable injury to the United States and be used to advantage by a foreign nation. The scope of these Non-Disclosure Agreements encompassed classified information referenced in this indictment.

6. In or about 2004, KIRIAKOU resigned from the CIA, after which time KIRIAKOU retained his continuing, lifelong obligation to the United States to protect the classified information to which he had been granted access while employed as an intelligence officer with the CIA.

7. Among the activities in which the CIA participated was an operation in Pakistan in or about March 2002 to capture Abu Zubaydah (the "Abu Zubaydah operation"), a terrorism subject then sought by the United States. The Abu Zubaydah operation fell within the scope of a CIA counterterrorism program known as the Rendition, Detention, and Interrogation Program (the "RDI Program").

8. Covert Officer A was a covert CIA employee whose association with the CIA had been classified for more than two decades. Covert Officer A was a covert agent as defined at Title 50, United States Code, Section 426(4). Specifically, at the time of the disclosure, Covert Officer

A was an officer of the CIA whose identity as such an officer was classified information, and who had served outside the United States within the last five years. As the defendant knew, the United States Government was taking affirmative measures to conceal Covert Officer A's intelligence relationship to the United States.

9. On or about July 11, 2008, KIRIAKOU received an email from Journalist A, a person not authorized by the United States Government to receive classified information who asked, "Can you remember the name(s) of any of the [specific CIA office] branch chiefs?" KIRIAKOU replied, "Sorry, [first name of Journalist A]. I never met any of those guys. And we never, ever dealt with them in [overseas city]."

10. On or about the same day, KIRIAKOU responded separately to two emails that Journalist A sent in reply to KIRIAKOU's email of earlier that day:

    a. In one email, Journalist A stated, "Presumably, [first name of Covert Officer A]." KIRIAKOU replied, "He had been my branch chief in [specific office,] [b]ut he's the only one I ever came into contact with."

    b. In a second email, Journalist A asked, "Presumably [first name of Covert Officer A] worked in that group though, right?" KIRIAKOU replied, "I assume he did. And actually, I'm not sure he was the chief of it. He was the team leader on [specific CIA operation], though."

11. On or about August 18, 2008, KIRIAKOU received an email from Journalist A asking KIRIAKOU to "pick out [first name of Covert Officer A]'s last name" from a list of names that Journalist A provided in the email, but which did not, in fact, include the name of Covert Officer A. Journalist A explained, "I'm not sure he's still in [country], but maybe he's on this list I've pulled."

12. On or about August 19, 2008, KIRIAKOU emailed the first and last name of Covert Officer A to Journalist A and remarked, "It came to me last night."

13. On or about April 8, 2009, in response to an email from Journalist A, who asked, "Ever know a [name] in [specific CIA office]," defendant KIRIAKOU replied, "Sorry, [first name of Journalist A]. I didn't know the [specific office] people by name except for [first name of Covert Officer A]."

14. On January 19, 2012, KIRIAKOU was interviewed by two FBI agents. The interview was recorded. During the interview, the agents informed KIRIAKOU that Covert Officer A's name had been included in a classified defense filing filed by defense attorneys representing high-value detainees at the U.S. Naval Station at Guantanamo Bay, Cuba. KIRIAKOU stated, among other things, "How the heck did they get him? . . . [Covert Officer A] was always undercover. His entire career was undercover." The agents asked, "Do you have any idea how anybody would have gotten his first and last name?" KIRIAKOU replied, "Oh, my God. No." KIRIAKOU also stated that he never provided Covert Officer A's name or any other information about Covert Officer A to any journalist and stated, "Once they get names, I mean, this is scary."

15. At the time of the unauthorized disclosure, the identification of Covert Officer A as "the team leader on [specific operation]" was classified at the Top Secret/SCI level because it revealed both Covert Officer A's identity and his association with the specific operation and the RDI Program.

16. When KIRIAKOU disclosed the identity of Officer A to Journalist A, KIRIAKOU acted willfully in that defendant knew the disclosure was illegal.

17. In addition to the foregoing proof, the defendant also acknowledges the following.

6

18. Officer B was employed by the CIA as an analyst assigned to the CounterTerrorism Center. Officer B was not a covert agent and his association with the CIA was not itself classified, but his association with certain CIA programs was classified. In or about March 2002, Officer B worked overseas with KIRIAKOU on the Abu Zubaydah operation. The association of Officer B with the Abu Zubaydah operation was classified until January 2012, when it was declassified for purposes of this prosecution.

19. In a series of emails in 2007 and 2008, after Officer B had retired from the CIA, KIRIAKOU disclosed to Journalist A and Journalist B that Officer B was associated with the Abu Zubaydah operation. Based in part on that disclosure, and on contact information reflected on Officer B's business card that Officer B had provided to KIRIAKOU after Officer B retired from the CIA, Journalist B published a June 22, 2008 article in *The New York Times* entitled "Inside the Interrogation of a 9/11 Mastermind" (the "Article"), which identified Officer B by name. In addition, unbeknownst to Kiriakou, Journalist A passed the information he obtained from KIRIAKOU to an investigator assisting in the defense of high-value detainees at Guantanamo Bay, Cuba.

20. When interviewed by FBI agents on January 19, 2012, KIRIAKOU was asked whether the association of Officer B with the Abu Zubaydah operation was classified. KIRIAKOU answered, "Absolutely, absolutely." However, KIRIAKOU denied providing Officer B's name or other information about Officer B to Journalist B prior to the June 22, 2008 New York Times article. Specifically, agents asked, "with regards to the [Journalist B] article – and [Officer B]'s name coming out in it. You had nothing to do with providing information to [Journalist B]?" KIRIAKOU answered, "Heavens no! On his . . . ? His identity and stuff like that?" The agent stated, "Yeah."

The defendant answered, "No." The agent asked, "Like his identity or contact information, or any of that stuff for [Officer B]?" KIRIAKOU answered, "No. He had it." The agent asked, "His identity and contact information [for Officer B]?" KIRIAKOU answered, "No."

21. In approximately 2009, KIRIAKOU authored a book, *The Reluctant Spy: My Secret Life in the CIA's War on Terror*, with a coauthor (the "book"), which purports to describe KIRIAKOU'S work on behalf of the CIA. Prior to the publication of the book, KIRIAKOU submitted multiple draft manuscripts of the book to the CIA's Publication Review Board ("PRB"), which reviewed the draft manuscripts to ensure that classified information would not be disclosed to the public.

22. As reflected in a transcript of a recorded interview conducted in or about August 2007 to assist KIRIAKOU's coauthor in drafting the book, KIRIAKOU described to his coauthor the technique, which KIRIAKOU referred to as the "magic box," and informed his coauthor that the CIA had used the technique in the Abu Zubaydah operation.

23. Subsequently, in the Article published in The New York Times on June 22, 2008, referenced above, the technique was disclosed and referred to as a "magic box." In an email dated June 30, 2008, KIRIAKOU again described the technique to his coauthor and stated that he thought "at the time [using the technique] was a great idea, conceptually."

24. A few days later, in an email dated July 2, 2008, KIRIAKOU's coauthor informed KIRIAKOU, among other things, that he had "just finished 6,000-plus words over two chapters on the Abu Zubaydah episode, I'm wondering how much of this PRB will let us publish." A few hours later, KIRIAKOU responded to his coauthor, stating, among other things, that "I'm guessing they'll let us publish a good chunk of the Abu Zubaydah story. They objected to some of the details of the

planning for the capture, but what I propose doing is telling them that we've fictionalized much of it (even if we haven't)."

25. Approximately one month later, by letter dated July 28, 2008 (the "Letter"), KIRIAKOU submitted a draft manuscript of the book to the PRB (the "Draft Manuscript"). (The Letter and Draft Manuscript comprise the first submission made to the PRB since the email exchange between KIRIAKOU and his coauthor on July 2, 2008.) In the Letter, KIRIAKOU sought permission from the PRB to include a description of the technique in the book stating as follows: "There is a reference early in this chapter to a device called a 'magic box.' I read about this so called device in a New York Times article. The information in that article was clearly fabricated, as we used no such device. I am unaware of any [such] device . . .As it is fictionalized, I believe it is unclassified." The Draft Manuscript described the use of the technique in the Abu Zubaydah operation.

26. On August 17, 2008, KIRIAKOU sent to his coauthor a copy of the Letter, along with the Draft Manuscript, by attaching them to an email and, in the text of the email, stated as follows: "Here you go, [first name of coauthor]. I laid it on thick. And I said some things were fictionalized

when in fact they weren't. There's no way they're going to go through years of cable traffic to see if it's fictionalized, so we might get some things through. Enjoy. John."

          Respectfully submitted,

          Neil MacBride
          United States Attorney

          Mark E. Schneider / Iris Lan / Ryan P. Fayhee
          Special Attorneys to the Attorney General

By: /s/ W. Neil Hammerstrom
          W. Neil Hammerstrom, Jr.
          Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JOHN C. KIRIAKOU, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*[signature]*
John C. Kiriakou
Defendant

I am JOHN C. KIRIAKOU'S attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 10/23/12

*[signature]*
Robert P. Trout
Counsel for the Defendant

Date: 10/23/12

*[signature]*
John F. Hundley
Counsel for the Defendant

Date: 10/23/12

*[signature]*
Mark J. MacDougall
Counsel for the Defendant

11