IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) CRIMINAL NO. 1:12-CR-127 |
| v. | ) |
| | ) The Honorable Leonie M. Brinkema |
| JOHN C. KIRIAKOU, | ) |
| | ) Sentencing: January 25, 2013 |
| Defendant. | ) |

POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Neil H. MacBride, United States Attorney, and Mark E. Schneider, Iris Lan, and Ryan P. Fayhee, Special Attorneys to the Attorney General, and Neil Hammerstrom, Assistant United States Attorney, in accordance with 18 U.S.C. § 3553(a) and the Plea Agreement entered pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, files this Position of the United States With Respect to Sentencing. Specifically, the government requests that this Court impose a sentence of 30 months' imprisonment, a supervised release term of three years, and a special assessment amount of $100, for the defendant's willful violation of the Intelligence Identities Protection Act, 50 U.S.C. § 421(a). This sentence, agreed by the parties, accords with the Plea Agreement, which this Court accepted and found to be reasonable at the conclusion of the defendant's plea colloquy on October 23, 2012.

The Plea Agreement in this matter is based not on the Sentencing Guidelines but instead on the specific negotiated sentence agreed to pursuant to Rule 11(c)(1)(C). *See United States v. Brown*, 653 F.3d 337, 339 (4th Cir. 2011). Nonetheless, the government notes that it has no objection to the Sentencing Guidelines calculations set forth in the Presentence Report.

1

I.    The Agreed Sentence of 30 Months Is Reasonable

   1.   Applicable Law

Section 3553 provides that the court should consider the nature and circumstances of the offense and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). In addition, it states that the court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B). In addition, the sentence should protect the public from further crimes of the defendant and provide the defendant with needed correctional treatment. 18 U.S.C. § 3553(a)(2)(C) & (D).

   2.   Discussion

As this Court determined in accepting the Plea Agreement, a sentence of 30 months is reasonable under 18 U.S.C. § 3553(a), given the nature and circumstances of the offense, the characteristics of the defendant, and the purposes of sentencing.

As reflected by the Statement of Facts and the Presentence Report, by the time of the illegal disclosures, the defendant was a former CIA officer who had held numerous security clearances and had signed multiple non-disclosure agreements acknowledging that unauthorized disclosures of classified information could cause irreparable injury to the United States or be used to advantage by a foreign nation. (Statement of Facts ¶¶ 2-6). At the time of the disclosures, based on the emails reviewed by the government, defendant was engaged in a concerted campaign to raise his media profile, principally to advance his private pecuniary interests through, among other things, consulting engagements, publication of editorials, more remunerative and secure employment, and sales of his forthcoming book. (*See, e.g.*, John Kiriakou, *The Reluctant Spy: My Secret Life in the CIA's War*

*on Terror* (2009)).

Despite knowing the grave damage that disclosures of classified information could cause, Kiriakou willfully disclosed to a journalist ("Journalist A") the name of a covert agent whose association with the CIA had been classified for more than twenty years ("Covert Officer A"), as well as classified information reflecting Covert Officer A's association with a CIA counterterrorism program known as the Rendition, Detention, and Interrogation Program (the "RDI Program") and a particular RDI operation. (Statement of Facts ¶¶ 7-13, 15-16). Indeed, and as he admitted in the Statement of Facts, the defendant made these disclosures, knowing that the government was taking affirmative measures to conceal Covert Officer A's intelligence relationship to the United States (Statement of Facts ¶ 8; *see also id.* ¶ 14 (reflecting defendant's admission to FBI agents that he was aware that Covert Officer A's "entire career was undercover")). Notwithstanding his recent unsworn denials reported in the media, *see* Scott Shane, *From Spy to Source to Convict*, N.Y. TIMES, Jan. 6, 2013, at A1 ("'If I'd known the guy was still under cover, Mr. Kiriakou said, 'I would never have mentioned him.'"), the defendant had specifically disavowed to this Court, under affirmation, that he had acted by "accident or mistake,"[1] and agreed instead that he acted "willfully," that is, he "knew the disclosure was illegal." (Statement of Facts ¶ 16). To the extent the defendant falsely denies

---

[1] Defendant testified as follows at his change of plea hearing:

THE COURT: Do you agree that in the 2008-2009 time period, in this district and elsewhere, that you *intentionally* — and *that means not by an accident or mistake* — disclosed information identifying a covert agent to an individual not authorized to receive classified information, and that *at that time, you knew* that the information disclosed identified the covert agent and that the United States government was taking affirmative measures to conceal that covert agent's intelligence relationship to the United States? Do you agree that that happened?

KIRIAKOU: Yes.

(Dkt. No. 119 (10/23/2012 Tr. 21 at 2-12) (emphasis added)).

elements of the offense or relevant conduct in a sentencing allocution, or again seeks to claim the misbegotten title of whistleblower,[2] such a claim should be squarely rejected and considered as a repudiation of his acceptance of responsibility for the criminal conduct he committed.

The defendant's illegal conduct was not limited his disclosures concerning Covert Officer A. Similarly, as Kiriakou admitted in the Statement of Facts, defendant also disclosed in series of emails to another journalist ("Journalist B") classified information reflecting the association of another CIA officer ("Officer B"), who was not a covert agent, to a particular operation in Pakistan in or about March 2002 to capture Abu Zubaydah (the "Abu Zubaydah operation"), despite knowing that Officer B's association to the operation was classified. (Statement of Facts ¶¶ 18-20). The defendant subsequently lied about both of these disclosures in a January 19, 2012 interview with agents from the Federal Bureau of Investigation, stating that he never provided Covert Officer A's name or any other information about Covert Officer A to any journalist. (Statement of Facts ¶¶ 14, 20). Defendant's deceit was also evident in his lies intended to trick the CIA Publication Review

---

[2] This Court has already rejected defendant's claim of vindictive prosecution, which defendant has nonetheless persisted in asserting elsewhere by falsely suggesting a linkage between this prosecution and his 2007 comments to ABC News and other media outlets. As the government has previously noted, the genesis of this prosecution was entirely unrelated to such statements by the defendant, and Kiriakou's claim to be a whistleblower can also be easily dismantled in light of his own prior statements. (*See* Dkt. No. 50 at 8-16). Specifically, Kiriakou relies heavily on his media statements about an interrogation technique known as waterboarding, referring in particular to statements made during a December 2007 interview with ABC. (*See, e.g.*, Dkt. No. 46 at 2). But Kiriakou's reliance on this interview is misplaced. Despite describing the technique as torture, he defended the technique, describing it as "something we needed to do"; as effective, given that "[t]he threat information that [Abu Zubaydah] provided disrupted a number of attacks, maybe dozens of attacks"; and legal, *i.e.*, "done within the rules." (*Id.* at 9 (citing *Transcript of ABC News Interview with John Kiriakou*, dated Dec. 10, 2007)). At the same time, Kiriakou explained that he came forward because he thought the CIA "had gotten a bum rap on waterboarding." *Live with Dan Abrams for December 11, 2007*, MSNBC http://www.msnbc.msn.com/id/22221848/#.UPhccpLNltk (last visited Jan. 17, 2013). Along the same lines, it is noteworthy that Kiriakou never suggested that Covert Officer A or Officer B engaged in wrongdoing in his emails to journalists. To the contrary, Kiriakou has described Covert Officer A as a "very good guy" (FBI Tr. 40), and claimed to have once been friends with Officer B. (FBI Tr. 28).

4

Board into inadvertently authorizing the publication of classified information. (Statement of Facts ¶¶ 21-26; Complaint ¶¶ 41-50; Complaint ¶ 48 ("I laid it on thick. And I said some things were fictionalized when in fact they weren't.")).

The kind of damage caused by the defendant's disclosures cannot be underestimated, and the disclosure of the identity of Covert Officer A is particularly compelling from a damage perspective. As the government has learned from Covert Officer A, his identity was so closely held for two decades, that even some members of his own immediate family did not know about his association with the CIA, let alone with any particular program or operation. (*See* Covert Officer A Victim Impact Letter). When viewed in this light, one gains a deeper understanding of not only the potential grave damage to national security, but also to Covert Officer A's personal safety and life. Indeed, it is for these reasons the government prosecutes the kind of criminal conduct perpetrated by the defendant, why it did so in this case, and why these criminal prohibitions are necessary to deter such conduct and meet the government's compelling national security interests.

It is also worth noting that the investigation that led to the discovery of Kiriakou's illegal disclosures began because photographs of CIA and other sensitive government personnel were discovered in the cells of high-value detainees at Guantanamo Bay, Cuba, and the identities of covert personnel appeared in a classified defense filing before the Military Commission at Guantanamo, despite having never been produced through authorized channels. (Affidavit in Support of Criminal Complaint, No. 1:12MJ33 (January 23, 2012) at 2-3, ¶¶ 4-6). The packet of photographs included four photographs of Officer B (*id.* at 20, ¶ 37), and the classified defense filing included both the true names of Covert Officer A and Officer B and their association with the RDI program. (*Id*. at 13, ¶ 23 (regarding Covert Officer A); *id.* at 21, ¶ 38 (regarding Officer B)). Through its investigation,

5

the government learned that an investigator assisting the defense team representing one or more of the high-value detainees had been looking for information regarding Covert Officer A and Officer B, but had been unable to successfully identify either officer, until Journalist A provided to him Covert Officer A's name and Officer B's telephone number (*id.* at 4-5, ¶ 10; *id.* at 12-13, ¶ 22; *id.* at 20, ¶ 26) — the very two pieces of information that the defendant had previously provided Journalist A, as described above. In short, defendant's illegal disclosures led directly to Officer B being secretly photographed and his photographs being tendered to high-value Guantanamo terrorist detainees — a result Kiriakou himself described as "terrifying." (*Id.* at 20, ¶ 36; Dkt. No. 50 at 11).

Finally, it is noteworthy that the two charged disclosures concerning Covert Officer A and Officer B were but the tip of the iceberg: the defendant's emails seized during the investigation revealed that Kiriakou disclosed to journalists information about dozens of CIA officers, including numerous covert officers of the National Clandestine Service beyond the one identified in the indictment, as well as others since retired. (CIA01800-21). As the narrowly framed charges reflect, the government was required to "balanc[e] the need for prosecution and the possible damage that a public trial [would] require by way of the disclosure of vital national interest secrets in a public trial." *United States v. Morison*, 844 F.2d 1057, 1067 (4th Cir. 1988). For purposes of sentencing, however, it is sufficient to note that for Kiriakou the charged conduct was in no sense aberrational or reflective of an atypical lapse of judgment.

Having worked fifteen years as a former CIA officer, Kiriakou knew this course of conduct was illegal; he had been warned of the consequences; he knew personally and intimately the grave dangers disclosures such as his posed to those who serve the United States; and he chose repeatedly to violate the law, despite all this. In making these decisions, Kiriakou intentionally betrayed the

6

trust that had been bestowed on him by the United States, and he betrayed numerous former colleagues who serve the United States in circumstances where silence is their only safety.

II.   Conclusion

For the reasons stated, the United States respectfully requests that this Court impose a sentence of 30 months of incarceration, with a supervised release term of three years.

                          Respectfully Submitted,

                          Neil H. MacBride
                          United States Attorney

By:             /s/
                    Mark E. Schneider / Iris Lan / Ryan Fayhee
                    Special Attorneys to the Attorney General

                    Neil Hammerstrom
                    Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Robert Trout / Jesse Winograd / John Hundley / Plato Cacheris
Trout Cacheris PLLC
1350 Connecticut Ave NW
Suite 300
Washington, DC 20036
(202) 464-3300
Counsel for John C. Kiriakou

I hereby certify that I will cause a copy to be delivered to:

Carla G. Coopwood
Senior U.S. Probation Officer
Masassas Virginia
(703) 366-2113

                                                /s/
Attorney for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314