Filed NO. 326 Clas P. 3:d
Information Security Officer
CISO _Allan_
Date: 1 / 18 / 2013

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 1:12-cr-00127-LMB |
| | ) Filed in Camera and Under Seal |
| JOHN KIRIAKOU, | ) With the Classified Information |
| | ) Security Officer |
| Defendant. | ) |
| | ) |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant John Kiriakou, by counsel, and respectfully submits this sentencing memorandum and attachments[1] for the Court's consideration.

On October 23, 2012, Mr. Kiriakou pled guilty to Count One of the indictment, charging him with intentionally disclosing information identifying a covert agent, in violation of the Intelligence Identities Protection Act ("IIPA"), Title 50, United States Code, Section 421(a). This Court accepted Mr. Kiriakou's guilty plea on October 23, 2012, and upon motion by the government, the remaining counts of the indictment were dismissed. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), Mr. Kiriakou and the government agree that a sentence of thirty (30) months of imprisonment, followed by three (3) years of supervised release, is appropriate. At the Rule 11 hearing on October 23, 2012, the Court indicated this was an appropriate resolution, accepted the guilty plea, and set the case for sentencing. Mr. Kiriakou's sentencing hearing is scheduled for Friday, January 25, 2013, at 9:00 a.m.

---

[1] The attachments consist of (A) letters submitted in support of Mr. Kiriakou and (B) a classified addendum that describes in more detail Mr. Kiriakou's service to the United States, including several awards and commendations he received for exceptional service in support of classified operations.

## Introduction

Mr. Kiriakou recognizes that because the plea was entered pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Court is bound to a sentence of a term of imprisonment of thirty (30) months on Count One, with no fine; a term of supervised release of three (3) years, and a special assessment of $100. Despite the fact that Mr. Kiriakou's sentence is fixed, he believes it is appropriate to present his background, the nature and circumstances of the offense, the advisory U.S. Sentencing Guidelines ("the Guidelines") calculation and other sentencing factors for the purposes of having a complete record, and to demonstrate why the agreed upon sentence is appropriate despite the term of imprisonment being below the recommended Guideline range.

Mr. Kiriakou has committed his life to public service and the defense of America's national security against hostile foreign powers and terrorist threats. In the course of his service to the United States and the Central Intelligence Agency ("CIA"), Mr. Kiriakou placed himself in harm's way on countless occasions, earning the CIA's Exceptional Service Award no fewer than ten times. In letters submitted to this Court, Mr. Kiriakou's former colleagues at the CIA have praised him as an officer of exceptional "integrity, dedication to mission, hard work, compassion and good humor" who "performed with discipline and brilliance." One former colleague describes him as "an unsung hero in pursuing the Agency mission." Another recalls "the amount of time he spent helping other coworkers despite the competitive environment in which we worked where kindness could be perceived as weakness." As detailed herein, Mr. Kiriakou's nearly fifteen years of distinguished service to the CIA, followed by more than two years of service as a Senior Investigator for the U.S. Senate Committee on Foreign Relations, demonstrate his extraordinary and selfless commitment to public service and his dedication to protecting our country and its allies.

2

Mr. Kiriakou's service to his country, and his commitment to the values and ideals that led him to a life of public service, continued after his retirement from the CIA when he made the decision to publicly comment on the CIA's excesses during the early years of what has been referred to as the "war on terror." In December 2007, Mr. Kiriakou gave an unprecedented interview to ABC News, during which he stated that the CIA had employed enhanced interrogation techniques, including waterboarding, which amounted to torture. In so doing, Mr. Kiriakou became the first person associated with the CIA to formally and publicly acknowledge the agency's use of so-called "enhanced interrogation techniques" on terrorist suspects. Although Mr. Kiriakou's statements angered many of his former friends and colleagues at the CIA – resulting in a report being filed with the Department of Justice based on the interview – Mr. Kiriakou's explanation for his actions was simple: "We're Americans and we're better than that." Although Mr. Kiriakou's actions in this regard were no doubt controversial, they were motivated by the same commitment to American values that led him to place his life on the line in service of national security.

In addition to serving this country, Mr. Kiriakou is a devoted husband and father of five children, was a thoughtful and caring son to his mother and father, and is a trusted and loyal friend to many. One friend and former colleague recounts, in his letter to the Court, how Mr. Kiriakou helped to save him from "sinking into depression" through simple acts of friendship and kindness after his wife's unsuccessful battle with cancer. Another recalls how Mr. Kiriakou "helped [him] through personal crises, including [his] late brother's battle against AIDS." And still another writes of Mr. Kiriakou's love and adoration for his wife and five children, and the "loving atmosphere, filled with compassion, warmth, and laughter" that Mr. Kiriakou has cultivated in his home.

3

Mr. Kiriakou has fully and forthrightly accepted responsibility for his actions and recognizes the seriousness of the crime to which he has pled guilty. Yet while many will never know Mr. Kiriakou apart from this prosecution, the incident that led to this moment cannot undo the reality of Mr. Kiriakou's life in full — a life dedicated to the values of freedom, decency, public service, and love of country. As the government concedes, although Mr. Kiriakou's crime was unquestionably serious, he was never motivated by any desire to harm the United States, national security, the CIA's critical mission abroad, or any individual person. The absence of such intent does not absolve him of responsibility for his crime, but it is an important factor in understanding why the fixed sentence is, appropriately, below the advisory Guideline range.

### The Nature and Circumstances of the Offense

In 2006, Journalist A told Mr. Kiriakou that he was working on a book about the Abu Omar rendition in Milan. That was false. Journalist A has never published a book on that subject and the defense is aware of no evidence that he was ever working on one. In reality, unknown to Mr. Kiriakou, Journalist A was acting as a private investigator on behalf of lawyers representing terrorist detainees in Guantanamo Bay, Cuba, and was forwarding the information he received from Mr. Kiriakou, as well as information he received from many other individuals, to another private investigator working with the detainees' lawyers. Mr. Kiriakou now realizes that he made a very serious mistake in passing any information to Journalist A, but he would not have done so had he known how Journalist A would make use of that information.

In July 2008, Journalist A sent emails to Mr. Kiriakou inquiring about the names of the branch chiefs at a specific CIA office. Mr. Kiriakou responded that he did not know the names. Journalist A persisted, asking questions about a CIA officer identified only by a first name. The questions themselves seemed to imply that Journalist A already had the name of the agent

4

REDACTED / CLEARED FOR PUBLIC RELEASE

referred to in the indictment as Covert Officer A. Mr. Kiriakou responded to Journalist A's questions in a manner that inferentially confirmed the first name – but only the first name – of the individual referred to as Covert Officer A.

Over a month later, on August 18, 2008, Journalist A emailed Mr. Kiriakou with a list of names and asked Mr. Kiriakou if he could identify from the list the last name of the person previously identified by first name only. The name came to Mr. Kiriakou that night, and early the next morning, without giving the matter much thought, he emailed the name to Journalist A. Shortly thereafter, without Mr. Kiriakou's knowledge, Journalist A emailed the name to a private investigator for a defense team representing Guantanamo Bay detainees.

Mr. Kiriakou's career is more than this one incident. During his more than fifteen years of service to the CIA, Mr. Kiriakou diligently guarded and protected the classified information entrusted to him. Mr. Kiriakou's conduct in protecting the nation's secrets over more than a decade amply demonstrates that his actions – while serious and wrong – were not in keeping with Mr. Kiriakou's normal behavior.

## Discussion of Sentencing Factors

Following *United States v. Booker*, 543 U.S. 220 (2005), the Court must impose a sentence in accordance with 18 U.S.C. § 3553(a), and should not presume that a sentence calculated pursuant to the Guidelines is appropriate, mandatory or reasonable. *See Rita v. United States*, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.") (citation omitted); *Gall v. United States*, 552 U.S. 38, 49-50 (2007) ("[T]he district judge should [] consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party.").

5.

A correctly calculated Guidelines range is a single factor for the Court to consider in imposing a sentence. 18 U.S.C. § 3553(a)(4). Ultimately, however, it is the § 3553(a) factors, on the whole, which justify a sentence. *Gall*, 552 U.S. at 60 (affirming district court's reasoning "that the § 3553(a) factors, on the whole, justified the sentence"); *United States v. Go*, 517 F.3d 216, 218 (4th Cir. 2008) (affirming district court's decision that the "3553(a) factors, on a whole, justify the extent of the variance" from the Guidelines range).

Most significantly, the court must impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2). *See also Kimbrough v. United States*, 552 U.S. 85, 100-01 (2007); *United States v. Tucker*, 473 F.3d 556, 561 (4th Cir. 2007). Those purposes include the need to (1) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (2) "afford adequate deterrence to criminal conduct"; and (3) "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A), (B) and (C).

Pursuant to § 3553(a), courts must also consider a number of other factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; the Guidelines; and "the need to avoid unwarranted sentence disparities." *Id.* at § 3553(a)(1), (3), (4), and (6).

A.  Advisory Sentencing Guidelines

Mr. Kirikaou submits that the total offense level for the offense should be calculated at level 28. This is derived from the base offense level of 30 under U.S.S.G. § 2M3.9, reduced by two points under U.S.S.G. § 3E1.1 for acceptance of responsibility. The advisory guideline range for offense level 28 (and Criminal History Category I) is 78-97 months imprisonment.

The government argued for a two point enhancement for obstruction of justice under U.S.S.G. § 3C1.1, claiming that the acceptance of responsibility reduction was not available where there was obstruction of justice. In the Presentence Report, the U.S. Probation Officer calculated a total offense level of 30, accepting the government's argument that Mr. Kiriakou obstructed justice, but rejecting the government's argument that Mr. Kiriakou was thereby precluded from receiving a reduction for acceptance of responsibility. For the reasons set forth below, Mr. Kiriakou respectfully submits that the probation officer was incorrect in applying a two point enhancement for obstruction of justice, but she was correct in finding that a two point reduction for acceptance of responsibility was appropriate, even if the obstruction of justice enhancement were applicable.

In its letter to the probation officer, the government contends that a two level enhancement applies "because the defendant attempted to obstruct and impede the investigation of the offense of conviction, and the obstructive conduct related to the offense of conviction and other relevant conduct described in the Plea Agreement." Specifically, the government alleges, without substantiating evidence, that Mr. Kiriakou "destroyed his incriminating emails with Journalist A" after being alerted to the fact that he was the subject of a government investigation. In the absence of evidence proving that Mr. Kiriakou deleted these emails in order to frustrate a criminal investigation of which he was aware, the enhancement for obstruction of justice cannot apply. Mr. Kiriakou denies that he deleted emails to obstruct or impede the government's investigation.

Although the government alleges that Mr. Kiriakou was told he was the target of an investigation and deleted relevant emails as a result, thereafter Mr. Kiriakou, in fact, voluntarily met with FBI agents, without the presence of counsel, in order to discuss the government's

7

investigation of the inclusion of certain information in filings by defense counsel for Guantanamo Bay detainees. Only at the end of the interview did Mr. Kiriakou learn that he was, himself, the target of the investigation. In short, if the email deletion was motivated by a concern that he was under investigation, then Mr. Kiriakou would not at a later date have voluntarily submitted to an FBI interview. The government's proffer as to the email deletion is highly speculative and does not satisfy the preponderance of the evidence standard necessary for a factual finding of obstruction of justice.

In addition, the enhancement for obstruction of justice should not apply because the government has not provided the defense with evidence with which to assess such a claim. While the defense is in possession of copies of Mr. Kiriakou's computer hard drives, the information on them is current as of the time of their seizure, which is after the government claims the emails were deleted. The government has not provided the defense with any analysis of Mr. Kiriakou's computers and files comparing the state of Mr. Kiriakou's email accounts before and after seizure. There is simply no way to know the breadth and nature of emails deleted beyond the small number the government wishes to focus on in order to enhance the recommended sentencing range.

As found in the final Presentence Report, even if the Court were to find the enhancement pursuant to U.S.S.G § 3C1.1 applicable despite Mr. Kiriakou's objections, that finding does not preclude a finding that Mr. Kiriakou – who pled guilty – has accepted responsibility for his

8

offense. The Guidelines specifically allow for instances where adjustments under both U.S.S.G. §§ 3C1.1 and 3E1.1 may apply. *See* U.S.S.G. § 3E1.1 (cmt. 4).[2]

**B. Other Sentencing Factors**

    1. <u>Mr. Kiriakou's Professional and Personal History</u>[3]

Pursuant to § 3553(a)(1), the Court must consider Mr. Kiriakou's "history and characteristics" when sentencing. In this case, that consideration must begin with Mr. Kiriakou's nearly fifteen years of courageous and exemplary service to the United States and the CIA.

Mr. Kiriakou joined the CIA in January 1990. During his service, he learned Arabic in order to carry out a two-year assignment            Thereafter, he worked as a political analyst focused on Middle Eastern countries, including Bahrain, Kuwait, Qatar, and Iraq before transitioning to operations work in the CIA. Such a transition was atypical and placed Mr. Kiriakou in more dangerous and potentially life threatening circumstances. Mr. Kiriakou served abroad in Greece in 1999, this time as a counterterrorist operations officer. While in Greece, Mr. Kiriakou was targeted by a terrorist organization, but the group assassinated a British military attaché instead. After leaving Greece, Mr. Kiriakou served in Pakistan as chief of counterterrorist operations. Later, he worked in the Osama bin Laden unit and was involved in the capture of Abu Zubaydah. Throughout his service to the CIA, Mr. Kiriakou put himself in harm's way in order to advance our country's national security interests.

---

    [2] In addition to objecting to the probation officer's calculation of the total offense level, Mr. Kiriakou objected to the probation officer's finding that Mr. Kiriakou has the ability to pay a fine. In light of the fact that no fine is called for under the agreed and binding sentence, Mr. Kiriakou will not otherwise address his ability to pay a fine in this memorandum.
    [3] A classified addendum to this memorandum is also being filed to more particularly articulate Mr. Kiriakou's contributions while in the CIA.

Even after his departure from the CIA, Mr. Kiriakou's commitment to public service continued through his work as a senior investigator for the Senate Foreign Relations Committee. During his employment, Mr. Kiriakou investigated the threat posed by terrorist cells in Yemen, Somalia, Ethiopia and Djibouti. He authored a report that exposed the danger these countries continued to pose to the United States, including from U.S. citizens who had become terrorists. In regards to that report, Mr. Kiriakou earned praise from the Senate Select Committee on Intelligence.

As noted above, Mr. Kiriakou is a fervent family man who left his position with the CIA in order to allow him a schedule that could accommodate visitation with his two oldest children. As one letter writer notes, every other week for years, Mr. Kiriakou would drive from Washington, D.C. to Warren, Ohio to visit his children from his first marriage. Mr. Kiriakou is committed to remaining active in all his children's lives and has great remorse as to the impact his imprisonment will have, particularly upon his three youngest children. This case has taken a great emotional and financial toll upon Mr. Kiriakou's family, which he deeply regrets. Nonetheless, Mr. Kiriakou looks forward to returning to and helping provide for his family once his term of imprisonment is completed.

## 2. The Seriousness of the Offense, Just Punishment and Deterrence

To counsel's knowledge, this is only the second criminal prosecution under the IIPA in history. It is the first in twenty-seven years. More recently, in the case related to Valerie Plame, there was a very high profile prosecution arising from the disclosure of a covert agent's identity. In that case, the covert agent's identity was very publicly and very widely disclosed, and it seems clear that the various actors' motivations underlying that disclosure of the covert agent's identity – petty political paybacks – were anything but noble. Although the government did bring an

indictment following its leak investigation, it was for obstruction, false statements, and perjury; no one was indicted under the IIPA. In the end, Scooter Libby challenged the prosecution, went to trial, was convicted, and was sentenced to thirty months imprisonment. The President of the United States promptly commuted the sentence of imprisonment so that Mr. Libby would not spend even one hour in confinement.

The history of the Plame case is recounted not to depreciate the seriousness of Mr. Kiriakou's offense. Rather it is to put his offense in context. No one could listen to Mr. Kiriakou's FBI interview and think that he did not understand the importance of not publicly disclosing the identity of a covert agent, a role that Mr. Kiriakou himself had.

In this case, Mr. Kiriakou never intended that Covert Officer A's name would be publicly disclosed. He thought – or rather, he was misled to think – that he was merely providing a potential source who might be willing to provide firsthand knowledge about activities that had already been widely reported in the press and that raised significant policy issues that continue to be debated today.

Misled as he may have been, he was also naïve and thoughtless not to have appreciated that once he made disclosure to anyone not entitled to have the information, he had no control over its use. Although Mr. Kiriakou's email to Journalist A regarding Covert Officer A's name did not result in a public disclosure as the Plame outing did, Mr. Kiriakou fully appreciates that the disclosure gave rise to the potential for the sort of abuse that the IIPA was intended to address. Mr. Kiriakou will pay a very dire price for his offense.

The 30 month sentence, albeit below the advisory guideline range, is nevertheless severe. Measured against the commuted sentence in the Libby case – where there was no guilty plea and where there was little but ugliness underlying Plame's very public outing – there can be little

11

doubt that Mr. Kiriakou's 30 month sentence is sufficient to satisfy the requirements of 18 U.S.C. § 3553. Mr. Kiriakou's prosecution and conviction has been heavily covered in the press, and to counsel's knowledge, there has been no suggestion that Mr. Kiriakou is receiving a sentence that is too lenient. If anything, the question has been raised whether it is too harsh.

Apart from the 30 months of imprisonment he faces, Mr. Kiriakou's actions have dramatically changed his life for the worse. Prior to his arrest, Mr. Kiriakou was a respected author, commentator, and consultant with a proud record of public service to the CIA and Senate Foreign Relations Committee. He had the ability to obtain well-compensated employment in the private sector. Now, he has suffered the loss of vocation, loss of reputation, loss of livelihood, not to mention the pain and humiliation he has visited upon his family. While the same could be said about many criminal defendants, given the high profile of this case, these collateral consequences are especially harsh in this case.

## C. Supervised Release Conditions.

Pursuant to U.S.S.G § 5D1.3, certain conditions of supervised release are mandatory while other "standard" conditions are discretionary. In light of Mr. Kiriakou's strong family ties, absence of a prior criminal record, and lack of a substance abuse problem, the discretionary conditions for supervised release are inapplicable.

## Conclusion

For the reasons stated herein, Mr. Kiriakou respectfully submits that the agreed sentence of 30 months imprisonment is reasonable and appropriate under 18 U.S.C. § 3553, notwithstanding that it is below the advisory sentence calculated under the sentencing guidelines. Mr. Kiriakou asks that he be allowed to self-surrender to the Bureau of Prisons once he is

12

assigned to a facility, and that the Court recommend the sentence be served at the minimum

security camp adjacent to FCI Loretto.

Respectfully submitted,

/s/ Plato Cacheris

Plato Cacheris
(Va. Bar No. 04603)
pcacheris@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave., N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

/s/ John F. Hundley

John Francis Hundley
(Va. Bar No. 36166)
jhundley@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave., N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

/s/ Robert P. Trout

Robert P. Trout
(Va. Bar No. 13642)
rtrout@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

/s/ Jesse I. Winograd

Jesse I. Winograd
(Va. Bar No. 79778)
jwinograd@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

/s/ Mark J. MacDougall

Mark J. MacDougall
(Admitted *Pro Hac Vice*)
mmacdougall@akingump.com
Attorney for John Kiriakou
AKIN GUMP STRAUSS
    HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 887-4510
Fax: (202) 887-4288

14

## Certificate of Service

I hereby certify that on this 18th day of January, 2013, I filed the foregoing Memorandum, by hand, with the Classified Information Security Officer pursuant to the Protective Order for Classified Information. Pursuant to the Protective Order, the Classified Information Security Officer will deliver the foregoing to the Court and to Counsel for the United States.

W. Neil Hammerstrom
Neil.hammerstrom@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Iris Lan
Iris.lan@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

Mark E. Schneider
Mark.schneider@usdoj.gov
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

/s/ Jesse Winograd

Jesse Winograd
(Va. Bar No. 79778)
jwinograd@troutcacheris.com
Attorney for John Kiriakou
TROUT CACHERIS, PLLC
1350 Connecticut Ave, N.W., Suite 300
Washington, D.C. 20036
Phone: (202) 464-3300
Fax: (202) 464-3319

**ATTACHMENT A TO DEFENDANT'S
MEMORANDUM IN AID OF SENTENCING**

**Fulton T. Armstrong**
213 North Abingdon Street
Arlington, Virginia 22203
January 2, 2013

The Honorable Leonie M. Brinkema
United States District Court for the Eastern District of Virginia
401 Courthouse Square
Alexandria, Va. 22314

Dear Judge Brinkema:

I have known John Kiriakou personally for about four years — and longer by his reputation as an outstanding officer of our intelligence community. I have never doubted his integrity, intelligence, respect for the law, and commitment to our nation. He is a good man, and his family, his friends, and his community need him.

John is one of the rare intelligence officers with whom I have worked over the years (including 24 years in CIA) whose belief in the Agency's mission — embodied in a quote from the evangelist John engraved in the great foyer of the headquarters building — never wavered. On the wall facing the stars commemorating Agency officers killed in action are engraved the following words: "And ye shall know the truth and the truth shall make you free." Mr. Kiriakou remained loyal to that throughout his career.

I believe Mr. Kiriakou's every action, including any misjudgments in conduct he may have made, were motivated by the highest ideals that our society reveres. He has repeatedly demonstrated to colleagues, peers and friends that he deserved — and still deserves — our trust and support. As a student, intelligence analyst, operations officer, friend, husband and father, he has brought enthusiasm, commitment and energy to all he does.

Often taking difficult risks, Mr. Kiriakou performed with discipline and brilliance. His autobiography, *The Reluctant Spy: My Secret Life in the CIA's War on Terror*, merely scratches the surface of the quality of officer that Mr. Kiriakou was while in the Agency. In support of the U.S. national interest and strictly within the chain of command, he repeatedly took risks that put him in harm's way on the street in hostile environments. He is an unsung hero in pursuing the Agency mission.

In support of the essential public interest in any democracy, moreover, he took risks in the bureaucracy that put him in harm's way — telling truth to power, constructively criticizing programs and operations when warranted, and cajoling enterprising colleagues to remain loyal to the organization's ultimate mission. I know well that this latter commitment cost him dearly, as it costs all in the minority who keep personal ambition in check and keep Agency mission in the fore of all they do. Refusing to "go with the flow" is morally satisfying but lonely and costly, but Mr. Kiriakou had the discipline to remain loyal to his beliefs.

On the staff of the United States Senate Committee on Foreign Relations, Mr. Kiriakou again demonstrated professionalism and commitment. As senior investigator, he successfully transferred his skills as an intelligence officer to conduct oversight of the departments and agencies over which the Committee had jurisdiction (State Department, USAID, the Broadcasting Board of Governors, etc.). He accepted the difficult task of peering into programs enjoying strong political and bureaucratic support, and he did it with delicacy and sophistication. One investigation on which he and I collaborated closely identified a series of problems with a popular program, and the recommendations in his final report helped the agency in question as well as other Senate officers concerned about how U.S. taxpayer money was being spent.

Mr. Kiriakou has also been a good and generous friend. After I retired from government service (after 31 years), he helped me learn how to do consulting, to find clients, and to service those clients. He never hesitated to help me with introductions, and our chats were consistently uplifting and inspirational. Washington is known as a cut-throat town, but Mr. Kiriakou repeatedly showed he was the opposite – a man who helped friends without preconditions.

It has been painful to watch Mr. Kiriakou's travails over the past year. He and his family have suffered deeply, but they have never once turned away from their commitment to the many values that have made our country great, including the values of integrity, honesty, and acceptance of responsibility for one's errors.

Sincerely,

Fulton T. Armstrong

December 15, 2012

The Honorable Leonie M. Brinkema
United States District Court for the Eastern District of Virginia
401 Courthouse Square
Alexandria, Va. 22314

Dear Judge Brinkema,

I am writing to you on behalf of Mr. John Kiriakou, whom I have known since 1998 when we were both serving the United States Government at the U.S. Embassy Athens. Since my return to Washington D.C. in 2000, I have remained in contact with John and over the last two years have returned to Virginia on occasions and been an overnight guest in his home. I've thus had the opportunity to see him at work serving his country and around his wife and small children, about whom he obviously cares greatly. I remember watching him play on the floor with his young daughter one evening at his home and it brought to my mind what an A-Z range of emotions and experiences he had had up to that point in his life. Here was a man who had played a key role in the capture of the terrorist Abu Zabaydah in Pakistan, showing his cool demeanor in a dangerous setting, yet he was equally comfortable playing "tickle monster" with his daughter and laughing like a fool.

John is a highly ethical individual, who has publicly spoken out about issues he has felt strongly about during his CIA career and afterwards. We actually disagree on certain issues of CIA practices, but John is a calm, rational fellow who believes everybody is entitled to their view. I actually use John as a positive example in my classes that I teach at Indiana University when discussing matters of conscience and ethical behavior by government employees, and where he has been a guest speaker. The students loved listening to his lecture and chatting informally with him for several hours.

John has overcome before a number of adverse challenges in his personal life and during his career overseas with the CIA. Nobody enjoys going to prison, but he will handle the situation well and make good use of his free time there. When he comes back out into society, I'm sure he'll find some way to make himself a contributor in whatever community he lands and he'll pick up with his family life. Hopefully that time in prison will be as short as the law allows.

Respectfully,

(Signed)
Gene Coyle (CIA ret)
Indiana University
Bloomington, Indiana



# CIVIL COURT OF THE CITY OF NEW YORK
### 141 LIVINGSTON STREET
### BROOKLYN, N.Y. 11201

CHAMBERS OF
THOMAS M. FITZPATRICK
JUDGE, HOUSING PART

December 20, 2012

The Honorable Leonie M. Brinkema
U.S. District Court
401 Courthouse Square
Alexandria, VA 22314

Dear Judge Brinkema,

John Kiriakou recently pled guilty to a felony in a case before you. I write this letter as a character reference on his behalf.

John has been my friend since 1982, when we were both freshmen at George Washington University. I know John to be as kind and gentle as he is soft spoken. He was a diligent student who attended GWU on a one half tuition academic scholarship. He worked and borrowed to pay the rest himself.

As a student, John always acted on behalf of fellow human beings. He was a regular volunteer at Miriam's Kitchen, a soup kitchen operated by the ecumenical GWU Campus Ministry. On several occasions he organized a bus to bring students to anti-apartheid protests at the South African Embassy. He helped lead an event called the OxFam America Fast for a World Harvest. He energetically lent himself to variety of causes that championed the meek.

Through the years he has been a loyal and caring friend. He has helped me through personal crises, including my late brother's battle against AIDS.

John is a dedicated and loving father of five children. For many years after a divorce John made the long drive from Washington to Warren, Ohio, every other week without fail, to visit his two oldest children.

John is an extremely patriotic American, who is proud of our ideals. For him, public service was a calling. In 1994, in Bahrain, I witnessed him display physical courage in the performance of his duty. One night, after hearing explosions and gunfire, he entered a Shia enclave at to observe and report on a riotous confrontation between angry young men and Pakistani mercenaries.

On the morning of September 11, 2001 my wife's foot was injured as she hurried down from her office on the 92nd floor of Two World Trade Center. In the war on terror John served our country with distinction. His exemplary service, courage and achievement were recognized with awards from the Central Intelligence Agency. My wife, Julia, and I are so very proud of him.

John is an extraordinary individual who conducts himself with honor and a very strong moral purpose. He cannot be praised enough. I am fortunate for his friendship.

Sincerely,

Thomas Fitzpatrick

9809 Limoges Drive
Fairfax, VA. 22032

The Honorable Leonie M. Brinkema,
United States District Court for the Eastern District of Virginia
401 Courthouse Square
Alexandria, Va. 22314

January 12, 2013

Re: John C. Kiriakou

Your Honor:

This is in regard to the case of John C. Kiriakou, who has pled guilty in your Court to the crime
of violating the Intelligence Identities Protection Act. I am profoundly saddened by this
situation, since I have known Mr. Kiriakou for over 20 years and regard him as a highly decent,
loyal, and honorable man who has endangered his safety and his life on behalf of his country, his
government, and his agency, the CIA.

I am a retired Foreign Service Officer, having served in the Department of State and in overseas
embassies for over 30 years. Currently, I am a private contractor in the Department of Defense,
Defense Intelligence Agency, Office of Counterintelligence. I am writing strictly as a private
individual, not on behalf of my company or any U.S. Government agency.

I first met Mr. Kiriakou in approximately 1991 when, as part of a work-related tour of several
countries, he visited the U.S. Embassy in Qatar, where I was the Political-Economic Officer. His
intellect and knowledge were impressive on that visit, but I got to really know him in Bahrain,
where we worked together from mid-1994 to mid-1996, and we have been friends since then. He
was Economic Officer, and I, as the head of the Embassy's Economic Section, was his direct
supervisor. John Kiriakou was an ideal officer – hard-working, resourceful, highly intelligent,
skilled at drafting reports quickly and accurately, responsive to tasking, always helpful, and with
a consistently positive attitude. His encyclopedic economic and political knowledge of Persian
Gulf countries – not limited to Bahrain – was a major asset for the Embassy.

The 1994-96 period when Mr. Kiriakou was making such a useful contribution to the U.S.
Embassy was not an easy time to be in Bahrain. Mostly it coincided with an Iranian-supported
1994-1999 Shia uprising against the Sunni-dominated government. His housing development
was surrounded by Shia villages, and getting home in the evening often involved threading his
way through a shifting maze of government road closures and opposition roadblocks of rocks
and burning tires. There were rarely nights when no bombs could be heard exploding in the
surrounding area. The worst explosion, June 25, 1996, was in nearby al-Khobar, Saudi Arabia,
rather than in Bahrain, but it was strong enough to totally shatter John's living-room windows.
That was the Khobar Towers bombing, in which 19 American servicemen died. The next day,
the Embassy dispatched John to al-Khobar to help with the USG response, and he saw the scene
of the destruction close-up before clean-up began, while it was still smoking and bloodstains
were still evident. That was the last major work assignment of Mr. Kiriakou's posting to
Bahrain, as he left a month later.

I believe that John's experiences in Bahrain and Saudi Arabia played a role in his decision to leave his safe job as an analyst and to transfer, a year later, into CIA Operations, with dangerous counter-terrorism work in Greece as his first assignment. Shortly after 9/11, he pushed for an assignment in the main counter-terrorism war zone of Afghanistan and Pakistan, as a result of which he was sent to Pakistan and led the capture of al-Qaeda terrorists, including the notorious Abu Zubaidah. Both of these assignments, in Greece and in Pakistan, were highly dangerous – John was literally risking his life. As his friend, I was very much concerned for his safety, and I expressed my concern to John over the risks he was taking, but he was adamant that they were things that needed to be done and that it was his duty to do what he could to make a difference. From numerous conversations with John over the past two decades, I am totally convinced of the intensity of his patriotism, of his strong desire to contribute to the fight against terrorism, and of his passion for the CIA and its mission.

In 2007, my wife died, after a two-year battle with cancer. I was facing profound loneliness, but, suddenly, nearly all my friends and former colleagues seemed to disappear. Almost no one called, wrote, invited me anywhere, or dropped by to check on how I was doing. Almost no one, except John Kiriakou. Objectively, there was nothing in it for him – I was between jobs, and had not reached a high level in the State Department before my retirement 10 years earlier. I am 20 years older than him; I'm a Republican and he's a Democrat; and I share no known sports interest with him. But out of the loyalty and decency which are so basic to his character, he kept in touch, he made sure we got together from time to time, he helped keep me from sinking into depression, and he helped me get my life to a new normal. That is the sort of person John Kiriakou is.

I cannot condone the crime to which John has pleaded guilty, but John Kiriakou is a fundamentally decent, loyal, honorable, and patriotic man who has repeatedly risked his life for our country and who has already suffered economic ruin as a result of this case.

Sincerely,

Donald A. Roberts

REDACTED - CLEARED FOR PUBLIC RELEASE

December 18, 2012

The Honorable Leonie M. Brinkema

United States District Court for the Eastern District of Virginia

401 Courthouse Square

Alexandria, VA 22314

Dear Judge Brinkema:

I have known John Kiriakou for 21 years and consider him to be a man of exemplary character. I met John in 1991 when we were both working as intelligence analysts at the CIA and found him to be honest and forthright, characteristics that I still admire in him today.

As a coworker, John consistently displayed qualities of integrity, dedication to mission, hard work, compassion and good humor. I respect his integrity and believe him to be trustworthy, reliable and sincere. He was consistently friendly, good tempered, and considerate to all around him. Whatever pressures arose at work he was unfailingly upbeat and respectful of others.

I am continually impressed by his kindheartedness for others, even when he is facing individual hardship. He has an extraordinary belief in the goodness of other people. He is willing to make the first move to restore a professional relationship or smooth an upset situation, putting his ego aside for the greater good of all. I consider him to be unselfish and kind, keenly aware of the needs of others without an agenda of his own. I recall instances when coworkers treated him unfairly, yet he never spoke badly about them. He tried to understand their motives and was unfailingly forgiving.

I especially admire John's humility. He has accomplished many achievements professionally for the greater good of us all, yet it never increased his ego. When we were young analysts, John was highly regarded by our office management for his exceptional work, yet he never became conceited or arrogant, the all-too-typical attitude of the star performers. I used to sit on the opposite side of a cubicle from John, and I was impressed at the amount of time he spent helping other coworkers despite the competitive environment in which we worked where kindness could be perceived as a weakness. Many years later after the capture of Abu Zubaydah, people at work would stop him in the hallway to thank him for his service to our country, and John would laugh and remark to me how amazing it was that strangers would stop to speak to him.

John has an extraordinarily warm and loving nature. He adores his wife Heather and their five children. Their welfare is his highest priority, and he always puts their needs above his own. Their home has a very loving atmosphere, filled with compassion, warmth, and laughter. He takes time to teach charity to his children, including participating in family outings of picking produce at nearby farms to be distributed at a local food bank. Moreover, he is a thoughtful friend and a generous host. And I continue to marvel at John's optimism. He seems to take every situation in stride and always manages to identify the bright side.

REDACTED - CLEARED FOR PUBLIC RELEASE

I recognize that he has pled guilty to a crime but staunchly believe that he remains a man of upright character, decency and integrity.

Sincerely,

Elizabeth Riedel

REDACTED - CLEARED FOR PUBLIC RELEASE

# ATTACHMENT B TO DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

REDACTED - CLEARED FOR PUBLIC RELEASE

## CLASSIFIED ADDENDUM TO DEFENDANT'S SENTENCING MEMORANDUM

Defendant John Kiriakou, by counsel, respectfully submits the following classified addendum to his sentencing memorandum to further aid the Court in obtaining a full picture of the defendant who is being sentenced. The purpose of this classified addendum is to describe in more detail certain classified aspects of Mr. Kiriakou's service to the Central Intelligence Agency ("CIA"), and in particular the basis for the ten Exceptional Performance Awards that Mr. Kiriakou received for his outstanding service in defense of the national security, including more than one instance in which Mr. Kiriakou placed his own physical safety, and even life, at risk for his country.

1.     Exceptional Performance Award (conferred August 2001)

In January 1999, due in part to his Greek heritage and Greek language fluency, Mr. Kiriakou was assigned to ⬚⬚⬚⬚⬚⬚⬚ Athens, Greece, to assist with counter-terrorism operations ⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚

⬚⬚⬚⬚⬚⬚ 17 November was especially feared within the intelligence community due to its reputation for lethally effective assassination operations, which, on December 23, 1975, resulted in the murder of the CIA's Athens Station Chief, Richard Welch. 17 November's victims subsequently included two U.S. military attachés and numerous Greek government ministers, journalists, and foreign diplomats.



2

Then, one morning in April 2000, Mr. Kiriakou accidentally overslept and realized that he would be late for a meeting at work. Ordinarily, Mr. Kiriakou would drive to work along a complicated route designed to evade any possible surveillance, but due to his lateness he made a hasty decision to drive along the straightest and shortest route. As usual, he was driving an armored car and was armed at the time. On his way in, he heard on the radio that traffic was backed up because of a terrorist incident. Eventually, he passed a white Range Rover which he recognized as belonging to a recently arrived British defense attaché. The windows had all been shot out and the interior of the car was covered in blood. When he arrived _____ he told ____ what he had seen. _____ confirmed with the British embassy that the British defense attaché had been assassinated.

In August of 2000, 17 November issued its official communiqué and acknowledgement of responsibility for the assassination of the British defense attaché. In the communiqué, 17 November stated that they had seen "the big spy" on the morning of the assassination, but elected not to target him because he was armed and driving an armored car and so had killed the British defense attaché instead. After this communiqué was published, the _____ informed John that his life was in too much danger and ordered him to leave.

For his service in Athens, which resulted in a near-attempt on Mr. Kiriakou's life by the terrorist organization 17 November, Mr. Kiriakou was awarded the CIA's Exceptional Performance Award in August 2001.

2. <u>Exceptional Performance Award (conferred December 2001)</u>

After returning to the United States in August 2001, Mr. Kiriakou was asked _____ to assist with a counter-espionage operation against a double-agent

[          ] This double-agent had asked to meet with the [          ] but [          ] believed it would be too risky to expose himself to a double-agent, so he asked Mr. Kiriakou to pose as the [          ] during a meeting with the double-agent. Mr. Kiriakou agreed.

Mr. Kiriakou met with the double-agent periodically for approximately six months, posing as the [          ] each time. Eventually, however, Mr. Kiriakou received a cable from the [          ] informing him that the [          ] had discovered that Mr. Kiriakou was not truly the [          ] Then, shortly before another scheduled meeting with the double-agent, the [          ] informed Mr. Kiriakou that [          ] the double-agent instructing him to shoot [          ] (Mr. Kiriakou's alias) at their next meeting. Mr. Kiriakou nevertheless agreed to meet with the double-agent as scheduled at a local hotel. During the meeting, [          ] were waiting secretly in an adjoining room, planning to arrest the double-agent, which they did when he entered the hotel room.

For his service in support of this operation, which involved a planned attempt on his life, Mr. Kiriakou received the CIA's Exceptional Performance Award in December 2001.

Mr. Kirakou's actions in this matter are described thusly in his 2001 performance evaluation: "February 2001 – Per tasking from CTC and NE Division, traveled to [REDACTED] [          ] At request of [REDACTED] returned in March, April, May, and June to conduct high threat meetings with same source. Briefed chief of [REDACTED] [          ] in Arabic, on same case."

3. Exceptional Performance Award (conferred March 1991)

The CIA created a Persian Gulf Task Force the night that Iraq invaded Kuwait in 1990 to serve as a twenty-four hour a day analytic operations center for President George H.W. Bush.

4

Mr. Kiriakou, then a Leadership Analyst in the Office of Leadership Analysis, was one of the original members of this task force. Mr. Kiriakou and other members of the task force worked literally around the clock for the duration of Operation Desert Storm, working five days on and one day off. For his contributions to the Persian Gulf Task Force, Mr. Kiriakou received the CIA's Exceptional Performance Award in March 1991.

    4.       <u>Exceptional Performance Award (conferred March 1991)</u>

Mr. Kiriakou received a second award for a particular aspect of his service as a Leadership Analyst during the first Iraq war. Mr. Kiriakou correctly predicted that Iraq For his accurate analysis and prediction, Mr. Kiriakou received the CIA's Exceptional Performance Award in March 1991.

    5.       <u>Exceptional Performance Award (conferred 1992)</u>

For his accurate analysis, Mr. Kiriakou received the CIA's Exceptional Performance Award in 1992.

6.   **Exceptional Performance Award (conferred September 1996)**

7.   **Exceptional Performance Award (May 1998)**

Mr. Kiriakou received an Exceptional Performance Award in May 1998 for another accurate analytical paper

8.   **Exceptional Performance Award (August 2002)**

Mr. Kiriakou played a key leadership role                    that led to the capture of Al Qaeda leader Abu Zubaydah in Faisalabad, Pakistan in 2002. Zubaydah was the first high ranking Al Qaeda leader captured since the terrorist attacks of September 11, 2001, and for his role in this successful operation, Mr. Kiriakou received the CIA's Exceptional Performance Award in August 2002. Mr. Kiriakou's annual personnel evaluation for 2002 describes his contributions to the CIA's operations in Pakistan plainly:

6

9.   Exceptional Performance Award (March 2004)

During the 1970s, the Greek terrorist group 17 November issued communiqués claiming responsibility for certain successful assassinations, including the assassination of CIA Station Chief Jack Welch in 1975. These communiqués were made public via the French philosopher Jean Paul Sartre, who passed them on to a French communist newspaper for publication.

For this action, Mr. Kiriakou received the CIA's Exceptional Performance Award in March 2004.

10.   Exceptional Performance Award (September 2000)

In September 2000, Mr. Kiriakou received an Exceptional Performance Award (which itself is classified) for his participation _____ that, due to its classification status as sensitive compartmented information, cannot be described in this paper.

In addition to these ten Exceptional Performance Awards, Mr. Kiriakou also received four Meritorious Unit Citations, awarded by the CIA to a particular group or task force for their collective performance, and two letters of commendation from the Director of the Office of Near Eastern and South Asian Analysis and from the Chief of the Persian Gulf Task Force.

7